IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

GEORGE F. MATHEIS, JR.,

        Plaintiff,

    v.

CSL PLASMA, INC.,

        Defendant.

:  Civil No. 1:17-cv-00785
:
:
:
:
:
:
:
:  Judge Sylvia H. Rambo

**M E M O R A N D U M**

This case under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §

12101 *et seq*., presents an issue of first impression within the Third Circuit:

whether a blood plasma donation center meets the definition of a "public

accommodation" under the ADA. Plaintiff George Matheis, Jr. brings this action,

alleging that Defendant CSL Plasma Inc.[1] ("CSL") unlawfully discriminated

against him due to his disability. Presently before the court is Defendant's motion

for summary judgment. (Doc. 26.) For the reasons that follow, the court will grant

Defendant's motion.

I.    __Background__

The relevant facts are not in dispute. CSL is the owner and operator of a

plasma donation center located in York, Pennsylvania. (Doc. 26-1, ¶ 2.) At its

heart, CSL's business model consists of screening potential blood plasma donors,

---

[1] CSL notes in its motion for summary judgment that Plaintiff erroneously added a comma
between "Plasma" and "Inc." when filing the complaint; however, neither party has attempted to
amend the caption to reflect this error. (Doc. 27, p. 1.)

accepting or rejecting those potential donors, taking blood plasma from approved donors, paying those donors for their plasma, and selling the plasma to pharmaceutical manufacturing companies. (*Id.* at ¶¶ 5-9.) CSL is regulated by the Food and Drug Administration ("FDA") and is licensed by the Secretary of Health and Human Services. (*Id.* at ¶¶ 12-16.) FDA regulations guide CSL in determining whether to accept or reject potential donors and require prospective donors to undergo a physical examination and complete a medical history questionnaire. (*Id.* at ¶¶ 17-18.) Members of the public are allowed in CSL's reception area, but must be screened and approved before being allowed into the plasma donation portion of the facility. (*Id.* at ¶¶ 22-23.) CSL staff members[2] obtain a blood sample and a "brief" medical history consisting of current health, surgeries, medications, diagnoses, tattoos, needle marks, and other related questions. (*Id.* at ¶¶ 26-27.) Staff members also perform a visual examination and may reject donors if they appear to have an undisclosed illness or if a disclosed illness appears particularly severe. (*Id.* at ¶¶ 28-30.) Staff use a medical reference document that lists common conditions and gives guidance on whether those conditions could cause a potential donor to be rejected. (*Id.* at ¶¶ 31-32.) If the

---

[2] FDA regulations require a licensed physician or an individual under a physician's supervision to determine the suitability of each donor. *See* 21 C.F.R. § 630.5(a). It does not appear that staff members are physicians or that a physician is always observing the intake process. However, 21 C.F.R. § 630.5(a) provides that a physician may delegate certain parts of the screening process to a "substitute or other trained person."

staff member is unsure whether a potential donor should be rejected, the staff member can call a licensed physician and consult about whether to accept or reject the potential donor. (*Id.* at ¶ 33.)

Plaintiff is a Pennsylvania citizen who has been diagnosed with post-traumatic stress disorder ("PTSD") stemming from a medical screening that occurred after a police-involved shooting. (*Id.* at ¶ 44.) Due to his disability, Plaintiff sometimes suffers from panic attacks when exposed to crowded or confined spaces, verbal altercations, or helicopter noise. (*Id.* at ¶¶ 45-46.) The symptoms associated with Plaintiff's PTSD range from physical paralysis to violent outbursts such as breaking a door off of its hinges if Plaintiff feels trapped in a confined space. (*Id.* at 48-49.) Despite his PTSD, Plaintiff successfully made approximately 90 plasma donations at the CSL facility between January and December 2016 and earned approximately $250-$300 per month from plasma donations. (*Id.* at ¶¶58-60.) Plaintiff never had a panic attack during the donation process. Since October 2016, Plaintiff has used a service dog, "Odin," to help him cope with his PTSD. (*Id.* at ¶¶ 50-51.) Odin was originally purchased as a pet and was not specifically "prescribed" by a medical professional. (*Id.* at ¶¶ 51-52.) Odin's training included "pressure therapy," which consisted of leaning on or lying against Plaintiff when a panic attack was imminent and "willful disobey," meaning

that Odin would leave his sitting position and lead Plaintiff out of the triggering environment. (*Id.* at ¶¶ 54-57.)

During Odin's initial training, Plaintiff brought him to the CSL facility to allow Odin to become comfortable with places that Plaintiff frequents. (*Id.* at ¶ 63.) A staff member initially told Plaintiff that dogs were not allowed in the facility. (*Id.* at ¶ 64.) Plaintiff was instructed to confer with a staff member and informed the staff member that Odin was a service dog used to help him deal with his anxiety. (*Id.* at ¶¶ 65-66.) Plaintiff was informed that CSL had a policy prohibiting service animals for anxiety, but allows service animals for vision-disabled and hearing-disabled patients. (*Id.* at ¶¶ 40, 67-70.) According to CSL policy, this limitation is not due to health concerns related to the dog's presence. (*Id.* at ¶ 42.) Instead, the need for a service dog for anxiety is an indicator that the potential donor's anxiety is too severe to safely undergo the donation process. (*Id.*) CSL essentially equates the use of a service dog with the need for "more than two medications daily" to treat anxiety-related issues, which is a standard reason to reject a potential donor. (*Id.* at ¶ 41.) This rejection criteria is based on 21 C.F.R. § 630.10(e)(2), which provides that a "donor is ineligible to donate when donating could adversely affect the health of the donor . . ." (*Id.* at ¶¶ 19, 41.) Apparently, CSL fears that a patient with severe anxiety could harm himself or herself if the donation process induces an anxiety or panic attack. (*Id.*)

After Plaintiff had been rejected as a donor and informed of the CSL policy, a CSL nurse told Plaintiff that he would be able to donate if he brought a note from his physician stating that he could donate safely. (*Id.* at ¶¶ 70-71.) While having this conversation with the CSL nurse, Plaintiff began to have a panic attack and left the facility aided by the nurse and a general manager. (*Id.* at ¶¶ 74-76.) Plaintiff has not returned to CSL or any other plasma donation center since that incident. (*Id.* at ¶ 77.)

On May 3, 2017, Plaintiff filed a complaint alleging discrimination under the ADA, as well as either negligent infliction of emotional distress or intentional infliction of emotional distress under Pennsylvania law.[3] (Doc. 1.) CSL filed an answer to the complaint on June 5, 2017. (Doc. 10.) After the conclusion of discovery, CSL filed the instant motion for summary judgment on March 3, 2018. (Doc. 26.) Plaintiff filed a brief in opposition on March 24, 2018, (Doc. 30,) and CLS filed a reply brief on April l5, 2018 (Doc. 32). The matter has been fully briefed and is ripe for disposition.

## II.  <u>Legal Standard</u>

Summary judgment is appropriate "if the pleadings, the discovery [including, depositions, answers to interrogatories, and admissions on file] and

---

[3] It is not readily apparent from the face of the complaint whether Plaintiff intended to allege intentional or negligent infliction of emotional distress. Regardless, Plaintiff has abandoned this claim. (Doc. 30, p. 6 n.1.)

disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Turner v. Schering-Plough Corp.*, 901 F.2d 335, 340 (3d Cir. 1990). A factual dispute is genuine if a reasonable jury could find for the non-moving party, and is material if it will affect the outcome of the trial under governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). At the summary judgment stage, a court may not weigh the evidence or make credibility determinations, but must consider all evidence and inferences drawn therefrom in the light most favorable to the non-moving party. *Id.* at 249; *Andreoli v. Gates*, 482 F.3d 641, 647 (3d Cir. 2007).

To prevail on summary judgment, the moving party must affirmatively identify those portions of the record which demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323-24. The moving party can discharge the burden by showing that "on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party." *In re Bressman*, 327 F.3d 229, 238 (3d Cir. 2003). If the moving party meets this initial burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts," but must show sufficient evidence to support a jury verdict in its favor. *Boyle v. Cty. of*

*Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998) (internal quotation omitted). However, if the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to the non-movant's case, and on which the non-movant will bear the burden of proof at trial," Rule 56 mandates the entry of summary judgment because such a failure "necessarily renders all other facts immaterial." *Jakimas v. Hoffman-La Roche, Inc.*, 485 F.3d 770, 777 (3d Cir. 2007) (internal citation and alterations omitted).

## III.  Discussion

Title III of the ADA provides that individuals with disabilities must be given full and equal access to places of public accommodation and the benefits, goods, and services associated with those accommodations.  42 U.S.C. § 12182(a).  In order to state a claim for discrimination under Title III, a plaintiff must demonstrate: (1) that he is disabled; (2) that the defendant qualifies as a place of public accommodation as defined by the ADA; and (3) that the defendant discriminated against him based on one or more of his disabilities.  *Sharrow v. Bailey*, 910 F.Supp. 187, 191 (M.D. Pa. 1995).  The parties do not contest that Plaintiff's PTSD qualifies as a disability under the ADA.  Thus, the court will turn first to a novel issue in this Circuit: whether a plasma donation center, such as CSL, is a "place of public accommodation" as defined by the ADA.

**A. CSL meets the definition of public accommodation under the ADA**

The ADA sets forth an enumerated list of places that qualify as a place of public accommodation:

> The following private entities are considered public accommodations for purposes of this subchapter, if the operations of such entities affect commerce-
>
> (A) an inn, hotel, motel, or other place of lodging, except for an establishment located within a building that contains not more than five rooms for rent or hire and that is actually occupied by the proprietor of such establishment as the residence of such proprietor;
>
> (B) a restaurant, bar, or other establishment serving food or drink;
>
> (C) a motion picture house, theater, concert hall, stadium, or other place of exhibition or entertainment;
>
> (D) an auditorium, convention center, lecture hall, or other place of public gathering;
>
> (E) a bakery, grocery store, clothing store, hardware store, shopping center, or other sales or rental establishment;
>
> (F) a laundromat, dry-cleaner, bank, barber shop, beauty shop, travel service, shoe repair service, funeral parlor, gas station, office of an accountant or lawyer, pharmacy, insurance office, professional office of a health care provider, hospital, or other service establishment;
>
> . . . .

42 U.S.C. § 12181(7).  The parties do not contest that CSL is a private entity and that it "affects commerce" because it supplies pharmaceutical companies with necessary material to produce pharmaceuticals which are, in turn, sold to the public or other medical service entities.  CSL argues that it does not fall within any of the enumerated categories of places of public accommodation.

Not surprisingly, "plasma donation center" is not a specifically enumerated entity that is defined as a public accommodation under the ADA. Plaintiff argues that a plasma donation center qualifies as an "other service establishment" under 42 U.S.C. § 12181(7)(F), because it is substantially similar to other entities on the enumerated list and because requiring a plasma donation center to meet the requirements of the ADA would effect the remedial purpose of the statute. *See Tawam v. APCI Fed. Credit Union*, No. 18-cv-122, 2018 WL 3723367, *6 (E.D. Pa. Aug. 6, 2018) (holding that a federal credit union is subject to ADA requirements because it is substantially similar to a "bank," which is an enumerated public accommodation). Although this court is aware of no other courts in this Circuit that have decided whether a plasma donation center qualifies as public accommodation under the ADA, courts in other jurisdictions have done so. Unfortunately, there is a split in authority between courts that have considered the issue. This court will begin its analysis by reviewing the relevant decisions from those jurisdictions.

The Tenth Circuit Court of Appeals appears to be the only federal appellate court to have decided this issue. In *Levorsen v. Octapharma Plasma, Inc.*, 828 F.3d 1227 (10th Cir. 2016), the district court held that plasma donation centers do not qualify as service establishments because, unlike Section 12181(7)(F)'s enumerated examples, they do not "provide a service to the public in exchange for

9

a fee." *Levorsen*, 828 F.3d at 1229. The Court of Appeals reversed the district court, holding that the exchange of a service for a fee is not dispositive on the issue of whether an entity is a public accommodation and that a plasma donation center is sufficiently similar to the examples listed in Section 12181(7)(F) to bring it under the purview of Title III of the ADA. *Id.* The underlying facts in *Levorsen* are substantially similar to those in the instant case. Levorsen was an individual seeking to donate plasma at a facility owned and operated by Octapharma. Octapharma and CSL's policies and business models are essentially identical. Allegedly,[4] Levorsen had donated numerous times at the Octapharma facility without incident. A staff member, however, became aware that Levorsen had been diagnosed with various psychiatric disorders, including borderline schizophrenia. *Id.* The staff person raised concerns that Levorsen's condition could cause him to have a schizophrenic episode and dislodge the needle during the donation process, resulting in harm to Levorsen or Octopharma staff persons. *Id.* Thus, Octapharma refused to allow Levorsen to donate unless he provided a note from his psychiatrist stating that he was medically suitable to donate.[5] Levorsen subsequently brought suit under the ADA, alleging that Octapharma discriminated against him on the

---

[4] The Tenth Circuit in *Levorsen* was reviewing a district court's grant of the defendant's motion to dismiss. Accordingly, both the district court and the Court of Appeals accepted the complaint's well-pleaded facts as true for purposes of disposing of the motion.

[5] A noteworthy distinction between *Levorsen* and the instant case is that Levorsen actually provided a psychiatrist's note to Octapharma, yet it still refused to allow him to donate.

basis of his disability. The district court dismissed Levorsen's complaint, reasoning that a plasma donation center was distinct from other service establishments because a plasma donation center paid members of the public and "performed the service" of drawing the blood, separating the plasma from the blood, and distributing the plasma to the pharmaceutical manufacturers.

The Court of Appeals began its analysis by citing two precepts a court must consider in determining whether an entity is a public accommodation under the ADA: (1) the remedial purpose of the ADA is to prohibit discrimination "on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation," and, thus, its terms must be liberally construed; and (2) the list of enumerated examples in Section 12181(7)(F) is not exhaustive; rather, they serve as mere illustrations. *Id.* at 1230 (citing *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 676-77 (2001); 28 C.F.R. pt. 36, app. C, at 893). The Court then looked to the preeminent canon of statutory interpretation: absent ambiguity or irrational result, the literal language of a statute is controlling. *Id.* at 1232 (citing *Edwards v. Valdez*, 789 F.2d 1477, 1481 (10th Cir. 1986)). In doing so, it rejected Octapharma's argument that it should apply the canons of construction, *ejusdem generis* and *noscitur a sociis*, which mean, respectively, "when a general term follows a specific one, the general term should be understood as a reference to

subjects akin to the one with specific enumeration," *Norfolk & W. Ry. Co. v. Am. Train Dispatchers' Ass'n*, 499 U.S. 117, 129 (1991), and "a word is known by the company it keeps," *Jarecki v. G. D. Searle & Co.*, 367 U.S. 303, 307 (1961). The Court concluded that the ordinary meaning of the term "service establishment" was unambiguous and, thus, the Court need look no further than the plain language of the statute. Further, the Court held that a plasma donation center was a service establishment because it "'assist[ed] or benefit[ed]' those who wish to provide plasma for medical use—whether for altruistic reasons or for pecuniary gain—by supplying the trained personnel and medical equipment necessary to accomplish that goal." *Id.* at 1234 (quoting Webster's Third New International Dictionary 2075 (2002) ("Webster's")).

Judge Holmes of the Tenth Circuit dissented, concluding that a plasma donation center was more akin to a manufacturing plant which would be excluded from the ADA's requirements. Judge Holmes, employing the canons of *ejusdem generis* and *noscitur a sociis*, determined that plasma donations centers were distinct from other enumerated service establishments in that they did not exchange a good or skilled act (*e.g.* shoe-repair, dry-cleaning, or accountant services) for compensation from a consumer. The dissent characterized the plasma donation centers as manufacturers, comparing them to paper mills that receive input in the form of wood and convert the wood into paper. In support of this characterization,

Judge Holmes cites public health laws that define blood plasma as a "biological product" and requires that biological products be marked with the identity "of the manufacturer of the biological product." 42 U.S.C § 262(i)(1); 262(a)(1)(B)(ii). Furthermore, FDA regulations define "manufacturers" as any "legal person or entity engaged in the manufacture of a product subject to license under the act . . .," which includes Source Plasma. *See* 21 C.F.R. § 600.3(t), 606.171(a); *see also* § 640.71(a) ("All steps in the manufacturing of Source Plasma, including donor examination, blood collection, plasmapheresis, laboratory testing, labeling, storage, and issuing shall be performed by personnel of the establishment licensed to manufacture Source Plasma . . ."). Based in part on these FDA regulations, Judge Holmes concluded that plasma donation centers were manufacturers rather than service establishments and, thus, were not subject to the ADA's public accommodation requirements.

In line with the dissent in *Levorsen*, the United States District Court for the Southern District of Texas in *Silguero v. CSL Plasma, Inc.*, No. 2:16-cv-361, 2017 WL 6761818, *1 (S.D. Tex. Nov. 2, 2017), *appeal filed* No. 17-cv-41206, (5th Cir. Nov. 30, 2017), held that plasma donation centers were not public accommodations under the ADA. Similar to *Levorsen* and the present case, *Silguero* involved two potential donors who were rejected due to their disabilities. *Id.* at *2-3. In *Silguero*, one donor had severe knee problems that CSL staff

determined could prevent him from safely transferring to and from the donation bed, and the other donor required a service dog to cope with anxiety issues. *Id.* The Texas court's reasoning was straightforward: it rejected the plaintiffs' argument that facilitating the donation of plasma was a "service" and held that plasma donation centers did not meet the definition of an "other service establishment" because they did not involve an exchange of goods or skilled acts for compensation. *Id.* at *7-8. The Texas court, like the dissent in *Levorsen*, applied the canons of *ejusdem generis* and *noscitur a sociis*, finding that the key defining feature of other service establishments listed in Section 12181(7) involved an exchange of something for money from the public. Accordingly, the court granted summary judgment in favor of CSL.[6]

---

[6] CSL cites two additional cases in support of its argument, but the court finds both unpersuasive. In *Maley v. Octapharma*, No. 12-cv-13892, 2013 WL 3814248 (E.D. Mi. July 22, 2013), the district court stated, in *dicta*, that a plasma donation center was not a public accommodation because it pays its "customers" rather than receives payment in exchange for something. The court in *Maley*, however, granted Octapharma's motion to dismiss because Plaintiffs failed to respond, and the court considered the motion unopposed. CSL also cites *Nguyen v. New Release DVD, LLC*, No. 16-cv-6296, 2017 WL 4864995 (E.D. Pa. Oct. 27, 2017), in which the court held that a DVD kiosk was not a service establishment. The *Nguyen* court explained that the kiosks were essentially vending machines from which a customer would rent a DVD movie, using a credit card, and to which the customer would return the movie at a later date. *Id.* at *4. The court concluded that it was not an "establishment" because it was not a fixed physical location akin to a store or office, relying on the Third Circuit's decision in *Peoples v. Discover Financial Services, Inc.*, 387 F.App'x 179, 183 (3d Cir. 2010). *Nguyen* is inapposite because it is undisputed that the CSL facility is a physical location. *But see Gniewkowski v. Lettuce Entertain You Enters., Inc*, 251 F. Supp. 3d 908, 918 (W.D. Pa. 2017) (distinguishing *Peoples* and holding that a website could fall within the definition of service establishment under the ADA).

In short, this court finds the reasoning of the Tenth Circuit to be persuasive and adopts that reasoning in concluding that CSL's plasma donation center is a public accommodation under the ADA.  Like the *Levorsen* Court, this court will begin its analysis by noting the remedial purpose of the ADA is to prohibit discrimination on the basis of disability and the court's duty to construe its terms liberally to achieve its purpose of providing equal access to disabled individuals. *PGA Tour, Inc.*, 532 U.S. at 676-77 ("[T]he legislative history [of the ADA] indicates [the phrase public accommodation] 'should be construed liberally' to afford people with disabilities 'equal access' to the wide variety of establishments available to the nondisabled.").  This court will also look first to the plain meaning of the phrase "other service establishment" in determining the proper interpretation of the term.  *In re Visteon Corp.*, 612 F.3d 210, 231 (3d Cir. 2010), *as amended* (July 15, 2010), *as amended* (July 19, 2010) ("a court must give effect to a statute's unambiguous plain language unless it produces a result demonstrably at odds with the intentions of its drafters or an outcome so bizarre that Congress could not have intended it." (internal quotation omitted)).

The *Levorsen* Court reasoned that service means "conduct or performance that assists or benefits someone or something," or "useful labor that does not produce a tangible commodity."  *Levorsen*, 828 F.3d at 1231 (citing Webster's at 2075).  Accordingly, the Court concluded "that a service establishment is a place

of business or a public or private institution that, by its conduct or performance, assists or benefits someone or something or provides useful labor without producing a tangible good for a customer or client."[7]  *Id.*  The phrase "assists or benefits someone or something," however, appears quite broad.   Arguably, any business "benefits" someone or something: a corporate office may benefit the public at large by designing a product or improving some service. These offices, however, are not "open to the public" and, thus, would not fall within the definition of a service establishment.  *See Shepherd v. U.S. Olympic Comm.*, 464 F. Supp. 2d 1072, 1083-84 (D. Colo. 2006); *see also Berardelli v. Allied Servs. Inst. of Rehab. Med.*, 900 F.3d 104, 113 n.4 (3d Cir. 2018) ("Under Title III, "public accommodations" include most places that are generally open to the public."). Even if occasional members of the public are invited in, this is insufficient to make normally private offices a public accommodation under the ADA.  *Jankey v. Twentieth Century Fox Film Corp.*, 13 F. Supp. 2d 1174 (C.D. Cal. 1998); *Doran v. 7-Eleven, Inc.*, 524 F.3d 1034 (9th Cir. 2008).   Furthermore, the majority in *Levorsen* distinguished the dissent's comparison between paper mills and plasma donation centers, noting that factories and industrial facilities not open to the public are also excluded.   *Levorsen*, 828 F.3d at 1234 n.8 ("Unlike [plasma donation centers,] paper mills don't typically hold themselves open as accepting

---

[7] The parties do not dispute that CSL qualifies as an "establishment;" instead, they argue whether the collection of plasma constitutes a "service."  *See Peoples*, 387 F.App'x at 183.

16

source product from individual members of the public. [Plasma donation centers,] on the other hand, are public-facing businesses."). Real estate open for lease or sale also need not follow ADA requirements. *Howeischer v. Deerwood Vill. Mall*, 281 F.R.D. 665 (M.D. Fla. 2011). The text of the ADA itself creates some exceptions. *See* 42 U.S.C. § 12181(7)(A) ("an inn, hotel, motel, or other place of lodging, *except for an establishment located within a building that contains not more than five rooms for rent or hire and that is actually occupied by the proprietor of such establishment as the residence of such proprietor*"). Because exceptions exist to the ADA's broadly applicable definition of "public accommodation," CSL's concerns that including plasma donation centers exceeds the congressional intent of the ADA and its remedial purpose are largely assuaged. (Doc. 32, p. 5-6 (citing *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018)).

Because this court concludes that the plain language of the statute controls, the court's inquiry need not extend further. *See United States v. Locke*, 471 U.S. 84, 96 (1985). However, even if this court were to apply the canons of *ejusdem generis* and *noscitur a sociis*, as did the *Silguero* court and the dissent in *Levorsen*, the court would still conclude that compensation from a consumer is not a required factor in determining if an entity qualifies as a "service establishment" under the ADA. Under either canon, where a general term follows a specific term or terms, a

court is to interpret the general term in accord with the specific term. *Norfolk & W. Ry. Co.*, 499 U.S. at 117. Here, the relevant specific terms are "laundromats, dry-cleaners, banks, barber shops, beauty shops, travel services, shoe repair services, funeral parlors, gas stations, lawyers' offices, accountants' offices, pharmacies, insurance offices, health care providers' professional offices, and hospitals." Both the dissent and the Texas court found the common connection between these types of businesses to be that they all required payment in exchange for the performance of skilled acts or the use of specialized equipment. Although Judge Holmes and the *Silguero* court found the payment element to be the *sine qua non* of a service establishment under the ADA, this court disagrees. For example, hospitals are required to treat patients regardless of their ability to pay. Other health care providers and pharmacies also do not always receive payment directly from the consumer for services rendered. It is true that pharmacies, health care providers and, sometimes, hospitals, do receive payment from insurance providers; yet, CSL is paid for the "services" rendered, simply from a different entity than the person for whom it performs a "service." Likewise, banks do not always profit by charging a fee from consumers. In fact, the traditional model of a private bank is that it holds money in trust for its customers and, rather than charge a fee for doing so, loans that money out to others and charges interest on those loans. A bank is

unquestionably included as a service establishment, yet it profits from a third party rather than direct payment from the consumers to whom it provides a service.

Judge Holmes also offered an alternative definition of a service establishment:

> [E]very service establishment listed in [Section] 12181(7)(F) shares some key unifying traits: they offer to the public a 'service' (1) in the form of (a) expertise (*e.g.*, barbers, beauticians, shoe-repair craftsman, dry cleaners, funeral parlors, lawyers, accountants, insurance offices, pharmacists, health care providers, and hospitals) or (b) specialized equipment (*e.g.*, laundromats and gas stations), (2) for use in achieving some desired end of the public, (3) in exchange for compensation.

Here, the first two factors are clearly met. CSL uses skilled staff and specialized equipment to screen potential donors, extract blood, and separate it into component parts. This achieves the desired end of the public in donating plasma. As discussed above, this court does not view the exchange of compensation to be dispositive; however, CSL is compensated for its effort: it is paid by the pharmaceutical companies. Thus, it would arguably satisfy the dissent's own criteria in that it receives compensation for its services.

Although the *Silguero* court did not look to regulatory definitions in order to determine whether a plasma donation center meets the definition of a service establishment under the ADA, Judge Holmes noted that various statutes and FDA regulations define plasma donation centers as manufacturers rather than service

providers. In contrast, the Department of Justice ("DOJ") submitted an *amicus curiae* brief to the Tenth Circuit in *Levorsen* interpreting its own Technical Assistance Manual to include plasma donation centers as public accommodations. As noted by the Government in its *amicus* brief in *Levorsen*, the FDA's definition of manufacturer also includes hospitals, which are expressly included in the definition of a public accommodation. *See* Brief for United States Department of Justice as *Amicus Curiae* Supporting Appellant, *Levorsen v. Octapharma Plasma Inc.*, 828 F.3d 1227 (10th Cir. 2016), 2015 WL 3989041, *6. Additionally, the FDA regulations are not entitled to *Chevron* deference in this instance because the FDA is not the agency tasked with regulating ADA compliance. *De La Luz v. Attorney Gen. of U.S.*, 578 F. App'x 156, 157 n.2 (3d Cir. 2014) ("We defer under *Chevron* 'when an agency construes or interprets a statute that it administers'") (quoting *Knapik v. Ashcroft*, 384 F.3d 84, 87 (3d Cir. 2004)). The DOJ's *amicus* brief, however, is entitled to some persuasive weight. *Smiley v. E.I. Dupont De Nemours & Co.*, 839 F.3d 325, 329 (3d Cir. 2016), *cert. denied sub nom. E.I. Du Pont De Nemours & Co. v. Smiley*, 138 S. Ct. 2563 (2018) ("Under *Skidmore* [*v. Swift*, 323 U.S. 134 (1944),] '[t]he weight of [an agency's] judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of

its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.'").[8]

The remedial nature of the ADA requires this court to construe the definition of a public accommodation broadly to achieve the purpose of the ADA. Although a plasma donation center rests on the fringe between a service establishment and a manufacturer, the distinction becomes apparent when compared to establishments that do not provide a "service" as defined by prior case law. For example, a car manufacturing plant clearly does not fall within the bounds of Title III of the ADA because the general public is not admitted and it provides no service, or anything bearing hallmarks of a service, directly to the public. Likewise a corporate headquarters is not subject to Title III because the public would not typically be admitted and they take no action that serves individuals. In contrast, the plasma donation center is accessible to the general public and in fact encourages persons to

---

[8] Because this court concludes that the plain language of Section 12181(7)(F) is unambiguous, the DOJ's interpretation does not warrant a higher degree of deference. *See Chase Bank USA, N.A. v. McCoy*, 562 U.S. 195, 211 (2011). ("[U]nder our precedent deference to the Board's interpretation of its own regulation, as presented in the agency's *amicus* brief, is wholly appropriate") (citing *Auer v. Robbins*, 519 U.S. 452 (1997)); *Christensen v. Harris Cty.*, 529 U.S. 576, 588 (2000) ("*Auer* deference is warranted only when the language of the regulation is ambiguous.").

Furthermore, the DOJ's Technical Assistance Manual does not speak directly on the issue of whether a plasma donation center or similar entity qualifies as a service establishment. Instead, the *Levorsen* Court looked, as does this court now, to the DOJ's *amicus* brief interpreting the Manual, which was not an invocation of the DOJ's rulemaking authority under the ADA. *See United States v. Mead Corp*, 533 U.S. 218, 226-27 (2001) (holding that an agency is entitled to *Chevron* deference only if it has made an appropriate formal ruling with a "lawmaking pretense").

walk in off the street to sell plasma. The donation center is far from the manufacturing plant that Defendant seeks to characterize it as. Except for separating the plasma from other blood components, the entirety of the pharmaceutical production occurs off-site and with a separate entity. Even construing the separation of blood from its component parts to be "manufacture," this process occurs after and distinct from the screening and donation process. A close analogy is a pawn shop or consignment store, although both clearly fall within a separate category of public accommodation because they have a sales aspect in addition to purchasing goods from the general public. A court would be hard-pressed to conclude that a consignment store would cease to be a public accommodation, however, simply by placing a wall between the room where clothes are bought and where they are sold. When compared to businesses clearly outside the purview of Title III, a donation center aligns more closely with a service establishment than an entity not subject to Title III. Because a plasma donation center is most similar to those types of business clearly included as service establishments and, by its conduct and performance, benefits the public by extracting plasma in exchange for a fee, this court finds that it falls within the ambit of Title III.[9] Having concluded that Title III of the ADA applies, the court will next address whether CSL lawfully excluded Plaintiff from donating.

---

[9] A closely analogous business is a recycling facility. Recycling plants receive waste products

### B. CSL had a legitimate, non-discriminatory reason for excluding Plaintiff from donating

Although this court holds that CSL must meet the requirements of Title III of the ADA, doing so does not require that CSL allow individuals with a disability to donate if that individual would endanger himself or herself, cause harm to a staff member of CSL, or cause CSL to violate FDA regulations. "The ADA does not require an entity or place of public accommodation to accommodate a person's disability by ignoring other duties imposed by law." *Rose v. Springfield-Greene Cty. Health Dep't*, 668 F. Supp. 2d 1206, 1216 (W.D. Mo. 2009), *aff'd sub nom. Rose v. Cox Health Sys.*, 377 F. App'x 573 (8th Cir. 2010) ("While the ADA is designed to allow disabled individuals to have meaningful access to the world through the use of service animals, it does not compel hospitals to jeopardize the health and safety of their patients." (citation omitted)). CSL argues that it had a legitimate, non-discriminatory reason for rejecting Plaintiff as a donor. Specifically, CSL asserts that Plaintiff's anxiety was severe enough to pose a risk of harm to Plaintiff or CSL staff if the stress of donating or the confined setting of

---

from consumers and pay the consumers for the waste received. In turn, a recycling plant processes the waste material and sells it as usable product to various manufacturers. At least one other court has held that a recycling plant is a service establishment under the ADA based on this type of business model. *Estrada v. S. St. Prop., LLC*, No. 17-cv-259, 2017 WL 3461290, *3 (C.D. Cal. Aug. 11, 2017) ("Although 'recycling center' does not appear among the public accommodations enumerated in the statute, [defendant] appears to qualify as an 'other service establishment,' within the meaning of the ADA"). The *Estrada* court, however, based its reasoning entirely on *Levorsen* without any additional analysis or discussion. *Id.* Thus, *Estrada* is of limited persuasive value except to note approval by other courts of *Levorsen*'s analysis.

the donation room induced a panic attack during the donation process. CSL's main concern appears to be that Plaintiff would have an attack while the needle used to draw blood was being inserted or was already in his arm, thus risking the needle being torn out of Plaintiff or jabbed into one of the CSL staff members.[10]  In a footnote, the *Levorsen* majority acknowledged similar concerns, but noted that defendant Octapharma would still be able to evaluate potential donors and reject them for legitimate medical reasons:

> Octapharma insists th[e Court's] conclusion will put [plasma donation centers] in an untenable position by creating a conflict between the ADA and certain regulations promulgated by the Food and Drug Administration.  *See, e.g.*, 21 C.F.R. § 606.100(b)(1) (requiring [plasma donation centers] to establish "[c]riteria used to determine donor eligibility, including acceptable medical history criteria"); 21 C.F.R. § 630.10(a) (noting that [plasma donation centers] must determine donor eligibility, and that donors aren't eligible if "not in good health" or if [plasma donation center] identifies "factor(s) that may cause the donation to adversely affect" a donor's health or the "safety, purity, or potency of the blood or blood component").  We find this argument unavailing. As the United States as *amicus curiae* points out, the [DOJ]'s Title III regulations explicitly allow public accommodations to "impose legitimate safety requirements that are necessary for safe operation," as long as those requirements are "based on actual risks and not on mere speculation, stereotypes, or generalizations about individuals with disabilities." []28 C.F.R. § 36.301(b)).  In any event, we do not hold today that Octapharma must allow Levorsen to donate plasma.  Nor do we take a position on whether Octapharma unlawfully discriminated against Levorsen under § 12182(a).  We hold only that Levorsen has access to Octapharma as

---

[10] CSL does not express any health-related concerns about having service dogs in the donation room, and CSL avers that it allows certain service dogs, those aiding sight-impaired or hearing-impaired individuals, into the donation rooms.  Furthermore, CSL expressed no fear that Odin specifically would have an aggressive reaction that would directly harm Plaintiff or CSL staff.

a public accommodation. Thus, we reject Octapharma's suggestion that our holding is fundamentally irreconcilable with the FDA regulations governing [plasma donation centers].

*Levorsen*, 828 F.3d at 1234 n.9 (citations omitted). Unlike the *Levorsen* Court, however, this court is called upon to determine whether CSL must allow Plaintiff to donate. For the reasons that follow, we find that, at this juncture, CSL need not allow Plaintiff to donate.

There is little in the way of guidance for when a public accommodation may deny access to a member of the public for medical reasons related to that individual's disability. Generally, in order to state a claim of discrimination under Title III of the ADA, a plaintiff must allege: "(1) that she is disabled within the meaning of the ADA; (2) that defendants own, lease or operate a place of public accommodation; and (3) that defendants discriminated against her by denying her a full and equal opportunity to enjoy the services defendants provide." *Sharrow*, 910 F.Supp. at 191. In this case, the court must draw a necessary, yet counterintuitive, distinction. CSL admittedly denied Plaintiff access due to his disability, yet that does not require a finding that CSL's reason was discriminatory. The DOJ has promulgated regulations that provide for reasonable safety accommodations for the safe operation of public accommodations: "A public accommodation may impose legitimate safety requirements that are necessary for safe operation. Safety requirements must be based on actual risks and not on mere speculation,

stereotypes, or generalizations about individuals with disabilities." 28 C.F.R. § 36.301(B). CSL is subject to numerous FDA regulations and must evaluate whether potential donors are medically safe to donate. 21 C.F.R. § 606.100. For instance, CSL must screen potential donors for HIV and other infectious diseases and defer donors that test positive for certain disease indicators even though HIV-infection has been held to be a disability under the ADA. 21 C.F.R. § 610.41; *Bragdon v. Abbott*, 524 U.S. 624, 639-45 (1998). The FDA regulations also mandate that a potential donor be "in good health . . . [and] is not eligible if the donor is not in good health or if you identify any factor(s) that may cause the donation to adversely affect: (1) the health of the donor; or (2) The safety, purity, or potency of the blood or blood component." 21 C.F.R. § 630.10(a). That same regulation sets forth guidelines for when a donor may be ineligible:

> A donor is ineligible to donate when donating could adversely affect the health of the donor, or when the safety, purity, or potency of the blood or blood component could be affected adversely. Your assessment of the donor must include each of the following factors:
>
> (i) Symptoms of a recent or current illness;
>
> (ii) Certain medical treatments or medications;
>
> (iii) Travel to, or residence in, an area endemic for a transfusion-transmitted infection, when such screening is necessary to assure the safety, purity, and potency of blood and blood components due to the risks presented by donor travel and the risk of transmission of that transfusion-transmitted infection by such donors;

(iv) Exposure or possible exposure to an accidentally or intentionally released disease or disease agent relating to a transfusion-transmitted infection, if you know or suspect that such a release has occurred;

(v) Pregnancy at the time of, or within 6 weeks prior to, donation;

(vi) Whether, in the opinion of the interviewer, the donor appears to be under the influence of any drug, alcohol or for any reason does not appear to be providing reliable answers to medical history questions, or if the donor says that the purpose of donating is to obtain test results for a relevant transfusion-transmitted infection; and

(vii) The donor is a xenotransplantation product recipient.

21 C.F.R. § 630.10(e). Notably, discrimination based on pregnancy is prohibited under Title VII, yet it is an express exclusion factor under the FDA regulations. *Ahern v. Eresearch Tech., Inc.*, 183 F. Supp. 3d 663, 669 (E.D. Pa. 2016) ("Discrimination based on pregnancy is prohibited as a subsection of the 'because of sex' category."). Some of these factors give CSL discretion in determining if a potential donor may be ineligible and do not solely relate to the possibility of infection from a blood borne pathogen. The "symptomatic" criteria requires the staff member or physician to evaluate the potential donor based on first-hand observations to determine if any undisclosed conditions may exist or if certain conditions are more severe than reported. At issue here, the second criterion, "[c]ertain medical treatments or medications," could include a broad range of disqualifying conditions. CSL has a policy that a service dog is a treatment for anxiety analogous to "more than two medications daily" to treat that same condition. (Doc. 26-1, ¶ 41.) This policy is based on CSL's belief that a patient

prone to anxiety or panic attacks could dislodge the needle and injure himself or herself during the donation process. Plaintiff admits that he has had panic attacks in the past with violent symptoms. (*Id.* at 48-49.)

The court does not hold that CSL will be "forced to relax its donor screening requirements, in order to satisfy the obligations of a place of public accommodation," and thus, "face revocation of its manufacturing license [from the FDA]." Francis M. Schneider, *Manufacturing Public Accommodation Under Title III of the ADA: The Tenth Circuit's Expansive Interpretation of "Service Establishment" to Include Manufacturers*, 56 Washburn L.J. 599, 627 (2017). CSL may still, and must still, evaluate each potential donor to determine if they meet all eligibility requirements for donation. The FDA regulations would not license CSL to reject a person that required the use of a wheelchair because it may be more burdensome to draw blood from someone in a wheelchair. Conversely, CSL would be mandated to reject that same person if he or she had been diagnosed with a blood borne illness, regardless of his or her disability. 21 C.F.R. § 610.41. In each case, the reason for the denial is based in fact and medical necessity rather than due to a discriminatory animus.[11] *See Larsen v. Carnival Corp.*, 242 F. Supp.

---

[11] CSL does not advance an argument that Plaintiff's condition falls within the "direct threat" exception to ADA requirements. Under Section 12182(b)(3) of the ADA, an entity need not permit an individual to participate if that individual poses "a significant risk to the health or safety of others that cannot be eliminated by a modification of policies, practices, or procedures or by the provision of auxiliary aids or services." *See Berardelli*, 900 F.3d at 119. Accordingly, the court offers no opinion on the applicability of the "direct threat" provision.

2d 1333, 1345 (S.D. Fla. 2003) ("[DOJ regulations] make it abundantly clear that while a public accommodation may not impose eligibility criteria that singles out persons with disabilities for exclusion, it may impose neutral eligibility criteria as a part of the screening process . . . The requirement that someone, by boarding a [cruise] vessel, should not critically jeopardize their own health is a neutral criterion that applies to those who are disabled and those who are not."). Other courts have discussed this distinction and have concluded that a denial or additional eligibility requirement may not be made solely due to an individual's disability status, but may be imposed if a symptom of that individual's disability creates a risk of harm to the individual or others. *See Theriault v. Flynn*, 162 F.3d 46, 49 (1st Cir. 1998) (holding that state did not violate ADA by requiring an additional drivers exam for individual with cerebral palsy where that individual had obvious and severe difficulties using his hands); *see also Bauer v. Muscular Dystrophy Ass'n Inc.*, 427 F.3d 1326 (10th Cir. 2005) (holding that entity's nationwide policy that camp counselors must be able to "lift and carry" disabled campers did not violate the ADA). The fact that CSL gave Plaintiff the option of obtaining a doctor's note is persuasive. *Cf. U.S. v. Asare*, No. 15-cv-3556, 2018 WL 2465378, *5 (S.D.N.Y Jun. 1, 2018) (holding that denying an HIV-positive patient cosmetic surgery due to concerns with antiretroviral medication without determining if specific drugs actually interfere with anesthetic violates the ADA).

A facility such as CSL that has legitimate concerns with the safety of its staff and donors should not be required to make a knee-jerk decision when faced with a potential safety risk: either accept a donor that may create a significant safety hazard or defend against repeated suits under the ADA.

In the present case, CSL articulated a reasonable belief that Plaintiff's anxiety was so severe as to risk endangering Plaintiff's health. Dr. John Nelson, CSL's Divisional Medical Director since 2005, submitted a declaration on behalf of CSL stating that CSL had a general policy to defer potential donors who had high levels of anxiety. (Doc. 26-1, ¶¶ 36, 40-41.) This policy is based on concern that someone with high anxiety could be prone to having a panic attack while a needle is in his or her arm. (*Id.* at 40-41.) Although CSL uses the term "defer" to mean both temporary and permanent rejection, the instant case relates, as of now, only to a temporary denial. CSL stated that it would admit Plaintiff if he provided it with a note from a psychologist stating that he could donate safely with Odin accompanying him. (*Id.* at 71.) Plaintiff declined or failed to do so. (*Id.* at 77.) Had Plaintiff provided such a note, yet was still rejected, he may have sufficient evidence to demonstrate that CSL's legitimate basis for denial was not related to a legitimate medical concern. Plaintiff produced no such note and never attempted to donate plasma again. Thus, CSL does not argue that an outright ban of Plaintiff is necessary, merely that they must temporarily defer his donation until it can

determine if his anxiety is at a level where he could safely donate. Accordingly, CSL has demonstrated a legitimate reason for temporarily rejecting Plaintiff and is entitled to summary judgment on Plaintiff's discrimination claims under the ADA. To be clear, however, the court does not hold that Plaintiff is *per se* ineligible to donate. Plaintiff may, in the future, demonstrate that the risk of a violent panic or anxiety attack is minimal and, thus, be eligible to donate under the FDA's safety regulations. He has yet to make such a demonstration.

**IV.** <u>**Conclusion**</u>

For the reasons set forth above, the court finds that CSL is a public accommodation under the ADA. Further, the court finds that Plaintiff proffered sufficient evidence to demonstrate a *prima facie* claim for discrimination based on his classification as disabled under the ADA; however, CSL has demonstrated a legitimate, nondiscriminatory basis for denying him access. Therefore, the court will grant Defendant's motion for summary judgment.

An appropriate order will issue.

                                             s/Sylvia H. Rambo
                                             SYLVIA H. RAMBO
                                             United States District Judge

Dated: September 27, 2018